**AVYNO LAW P.C.**
Edward F. O'Connor, Esq. (SBN 123398)
Email: efo@avynolaw.com
Jennifer H. Hamilton, Esq. (SBN 220439 )
Email: jhh@avynolaw.com
Jan A. Sundberg, Esq. (SBN 169186)
Email: jas@avynolaw.com
Shawn B. Hussain, Esq. (SBN 315872)
Email: sbh@avynolaw.com
6345 Balboa Blvd., Suite 208, Building I
Encino, CA 91316
Tel.: (818) 654-8841in
Fax: (818) 332-4205

Attorneys for Plaintiff
R and A Synergy, LLC

# UNITED STATES DISTRICT COURT

# FOR THE CENTRAL DISTRICT OF CALIFORNIA

# WESTERN DIVISION

| | |
|---|---|
| R AND A SYNERGY LLC, a California limited liability company,<br><br>Plaintiff,<br><br>vs.<br><br>SPANX, INC., a Georgia corporation,<br><br>Defendant. | **CASE NO.: 2:17-cv-09147-SVW-AS**<br><br>**SECOND AMENDED COMPLAINT FOR:**<br><br>**(1) TRADE DRESS INFRINGEMENT [15 U.S.C. § 1125];**<br>**(2) UNFAIR CMPETITION AND FALSE ADVERTISING [15 U.S.C. §1125(a)]; AND**<br>**(3) UNFAIR COMPETITION AND FALSE ADVERTISING [CAL. BUS. & PROF. CODE §§ 17200 and 17500 *ET SEQ.*].**<br><br>**[DEMAND FOR TRIAL BY JURY]** |

//

//

//

//

//

1      Plaintiff R and A Synergy, LLC, by and through its counsel, Avyno Law P.C.,

2  for its complaint against Defendant Spanx, Inc., alleges as follows.

3                                      **PARTIES**

4      1.      Plaintiff R and A Synergy, LLC ("Plaintiff R and A") is a California

5  limited liability corporation with its principal place of business in Los Angeles

6  County, CA.  Plaintiff R and A is engaged in the development and sales of slip-on

7  sleeves made to wear under sleeveless and strapless dresses and has made, sold

8  and/or licensed such products for sale since December 2011.

9      2.      Defendant Spanx, Inc. ("Defendant Spanx") is a Georgia corporation,

10  with its principal place of business at 3035 Peachtree Road, Suite 200, Atlanta,

11  Georgia 30305.  Defendant Spanx manufactures and sells undergarments and

12  clothing, targeted primarily to women, in the categories of leggings, tops, active

13  wear, shapewear, bras, panties and hosiery.

14      3.      Defendant Spanx is a corporation domiciled in Georgia, organized

15  under the laws of that state, and maintains its principal business office in Georgia.

16  Defendant Spanx maintains two retail stores in the Los Angeles area.  One retail

17  store is located at 395 Santa Monica Place #102, Santa Monica, CA 90401.   The

18  other retail store is located in the Los Angeles International Airport, Terminal 2,

19  200 World Way, Los Angeles, CA 90045.   Plaintiff R and A further alleges that

20  Defendant Spanx has committed the various acts (alleged below) which were

21  expressly aimed at Plaintiff R and A, a California domiciliary, and that jurisdiction

22  over Defendant Spanx is further established by: (1) their purposeful activities or

23  transactions with California, or residents thereof, by which they purposefully avail

24  themselves of the privilege of conducting activities in this forum; (2) the fact that

25  the claims alleged herein arise out of or relate to their forum-related activities; and

26  (3) the fact that the exercise of jurisdiction is reasonable, or comports with fair play

27  and substantial justice.

28

SECOND AMENDED COMPLAINT

**JURISDICTION AND VENUE**

4.     This is an action arising under the Lanham Act, 15 U.S.C. Section 1125(a).  This Court has federal question jurisdiction over these claims pursuant to 15 U.S.C. Section 1121 (action arising under the Lanham Act); 28 U.S.C. Section 1331 (federal question); 28 U.S.C. Section 1338(a) (any Act of Congress relating to trademarks); and 28 U.S.C. Section 1338(b) (action asserting claim of unfair competition joined with a substantial and related claim under the trademark laws).

5.     This Court has jurisdiction over the state law claims in this action pursuant to 28 U.S.C. Section 1367(a) because the state law claims are so related to the federal claims that they form part of the same case or controversy and derive from a common nucleus of operative facts.

6.     Based on information and belief this Court has specific personal jurisdiction over Defendant Spanx because it has purposefully committed, and continues to commit acts within the State of California, the acts from which these claims arise.  The Court also has general personal jurisdiction over Defendant Spanx as it conducts continuous, systematic, and routine business within the State of California and the County of Los Angeles.

7.     Venue is proper in the United States District Court for the Central District of California pursuant to U.S.C. Sections 1391(b) and 1391(c) because a substantial part of the events giving rise to the claims occurred in this District.

**FACTUAL BACKGROUND**

8.     Plaintiff R and A is engaged in the development and sales of slip-on sleeves made to wear under sleeveless and strapless dresses ("under sleeves") and has made, sold and/or licensed such under sleeves for sale, continuously and without interruption since December 2011.

9.     In 2008, Ruthann Greenblat, CEO and shareholder of Plaintiff R and A, conceived of the unique idea to create a sleeved garment specifically designed

SECOND AMENDED COMPLAINT

1  as a layering piece to wear under sleeveless and strapless tops and dresses

2  ("outergarment").

3      10.    From 2008-2011, Plaintiff R and A focused its efforts on research,

4  design and development of its under sleeves product line, spending a great amount

5  of time and resources building its business, protecting and developing its

6  intellectual property and designing its product line.

7      11.    On December 15, 2011, Plaintiff R and A launched its first website

8  offering basic under sleeves for sale under the brand name SLEEVEY WONDERS

9  ("Sleevey Website").  The SLEEVEY WONDERS under sleeves were advertised

10  on the Sleevey Website (www.sleeveywonders.com), as shown on ***Exhibit B***,

11  which website has been marked with copyright notices since its original launch.

12      12.    Since 2011, SLEEVEY WONDERS has offered at least two basic, yet

13  aesthetically distinctive and classic designs, for sale under the mark SLEEVEY

14  WONDERS: Jersey Design and Sheer Design. The first design, which is known as

15  the "Jersey Design," is defined by a garment having long sleeves extending onto

16  the forearms of the wearer, having a torso member, where the torso member ends

17  just below the bust of the wearer, covers the breast of the wearer and includes a

18  high back neckline, with a lower front neckline, and where the torso member and

19  the arms are both form fitting to hug the contours of the body of the wearer, and

20  where the arms of the garment are formed of a light-weight, smooth, jersey

21  material having no visible design elements on the fabric (the "Jersey Trade

22  Dress").

23      13.    The second design, which is known as the "Sheer Design," is defined

24  by a garment having long-sleeves extending onto the forearms of the wearer and a

25  torso member, where the torso member ends just below the bust of the wearer,

26  covers the breast of the wearer and includes a high back neckline with a lower

27  front neckline and where the torso member and the arms are both form fitting to

28  hug the contours of the body of the wearer, and where the arms of the garment are

SECOND AMENDED COMPLAINT

1  formed of a light-weight, smooth, sheer material having no visible design elements
2  on the fabric (the "Sheer Trade Dress").

3       14.    Attached as ***Exhibit A*** is a true and correct copy of Plaintiff's product
4  in black bearing the Jersey Trade Dress.  Attached as ***Exhibit B*** is a true and
5  correct copy of Plaintiff's product in black bearing the Sheer Trade Dress.  The
6  Jersey Trade Dress and the Sheer Trade Dress shall be collective referred to in this
7  complaint as the "Trade Dress Designs."

8       15.    The Jersey Trade Dress comes in a variety of colors including black,
9  white, off-white, gray, sand, pink, cobalt blue, green, brown, purple, navy blue,
10  red, coral and mint.  The Sheer Trade Dress comes in a variety of colors including
11  black, white, bone, ivory, silver, gray, navy blue, periwinkle blue, apple green,
12  olive green, purple, taupe (nude), brown, turquoise and red.

13       16.    Plaintiff R and A markets and sells its Trade Dress Designs by
14  showing its Trade Dress Designs on a torso wearing the Trade Dress Designs under
15  a sleeveless or strapless dress or top.

16       17.    Plaintiff R and A also markets and sells its Trade Dress Designs by
17  photographing a person wearing a sleeveless dress or top without the Trade Dress
18  Designs being worn underneath next to a photograph of a person wearing the Trade
19  Dress Designs underneath various styles of sleeveless dresses or tops.

20       18.    The Jersey Trade Dress and the Sheer Trade Dress designs are both
21  non-functional and both create unique and aesthetically distinctive designs.  In
22  particular, it is a design choice to select and use a light-weight, smooth, jersey
23  material having no visible design elements on the fabric for the Jersey Trade Dress
24  and to select a light-weight, smooth, sheer material having no visible design
25  elements on the fabric material for the Sheer Trade Dress.  Further, it is purely a
26  design selection to include a high back neckline on the garment, with a lower front
27  neckline, and to make the sleeves long sleeves, extending to the forearms of the
28  wearer, to make the garment a crop-top design, and stop the garment just under the

breast of the wearer.  In particular, many other types of materials, that may include or exclude design elements, may be used to create a different appearance for the garment without departing from any functional features offered by the garment. Further, whether to include a high or low back neckline, long or short sleeves, or whether to include an extended torso that covers the belly of the wearer or whether to design the product as a body suit are purely design related options.  To the extent that any of the individual elements in the Trade Dress Designs can be argued functional, the overall Trade Dress Design remains aesthetic and results in an overall combination of design features that result in a protectable trade dress.

19.    The Jersey Trade Dress and the Sheer Trade Dress designs have acquired secondary meaning.  Courts apply a well-established six-factor test to establish secondary meaning, including: (1) whether actual purchasers associate the product with the source (which can be shown through customer surveys); (2) the degree and manner of advertising by the party seeking protection; (3) the length and manner of use; (4) whether the use by the party seeking protection has been exclusive; (5) sales success of the trade dress design; and (6) attempts by others to imitate. No single factor is dispositive. Therefore, these factors in combination may show that consumers consider a mark to be an indicator of source even if each factor alone would not prove secondary meaning.

20.    The Trade Dress Designs are the classic designs offered by Plaintiff. Regarding the length and manner of use, Plaintiff R and A has continually made and sold its Trade Dress Designs without interruption, since December 15, 2011. Plaintiff R and A further engages the services of independent marketing and sales consultants in the US and foreign jurisdictions that have been responsible for marketing, selling and placing the Trade Dress Designs in retail stores and boutiques across the United States.  Such independent marketing and sales consultants have further been responsible for the placement of Trade Dress Designs in various catalogs.

1    21.    Since December 2011, Plaintiff R and A participated in numerous

2    tradeshows, including but not limited to the following nationally and

3    internationally recognized trade shows:  WWIN Las Vegas, Atlanta Gift and

4    Atlanta Fashion, Dallas World Trade Center, MODA NY, NEAC, Metro, and

5    TRENDS.

6    22.    The Trade Dress Designs are sold in at least 1,500 retail stores across

7    the United States and Canada, as well as stores in Australia, New Zealand and the

8    UK.

9    23.    Regarding the sales success of the Trade Dress Design, Plaintiff has

10   also been very successful in selling its Trade Dress Designs over the last nine

11   years, and generated over 5 million dollars in revenue from the sales of its Trade

12   Dress Designs since December 2011 through its website and through its retailers,

13   distributors and through its licensees.

14   24.    Regarding exclusivity, Plaintiff has maintained exclusivity of the

15   product and, in the keeping and recognition of its exclusive rights, entered into a

16   license agreement in November 2012 with Magic Tap LLC ("Magic Tap"), which

17   licensed Plaintiff R and A's Trade Dress designs under a private label brand,

18   SLEEVEY MAGIC.  As further set forth below, Plaintiff has also maintained

19   exclusivity through its continued and extensive enforcement efforts against third

20   party infringers.

21   25.    Magic Tap, under license from Plaintiff R and A, sold thousands of its

22   Trade Dress Designs under the trademark SLEEVEY MAGIC until its license

23   terminated in 2015.  Magic Tap advertised and sold the SLEEVEY MAGIC under

24   sleeves through a direct TV site, through YouTube channels, on its website and

25   through retail stores, including but not limited to, Walgreens.

26   26.    Regarding the degree and manner of advertising, as set forth above,

27   Plaintiff has attended numerous trade shows, has advertised in a number catalogs,

28   has maintained a website continuously and without interruption since December

15, 2011 that advertises and sells the Trade Dress Designs, has maintained an Instagram account continuously and without interruption since 2013 and maintained its Facebook Page continuously and without interruption since 2012. Plaintiff continually runs ads, videos and posts a number of videos and sale offers on all its different social media platforms.  Through its licensee, the Trade Dress designs were advertised for sale on a direct TV site and through YouTube Channels.  Each year since its initial sales, Plaintiff has spent least $225,000 on average per year for the past 5 years on the marketing and advertising of its Trade Dress Designs (or over $1,225,000 total over the past five years in marketing and advertising expenses).

27.   <u>Regarding attempts by others to imitate</u>, over the past five (5) years, Plaintiff R and A has been aggressively enforcing its rights against numerous knock-offs in the market place to protect its Trade Dress Designs.  Plaintiff has had to continually enforce its rights against other third parties attempting to imitate its products, including taking down multiple sales of identical products on Alibaba, Shopify, Facebook.com, Instagram, Amazon.com and Walmart.com (to name a few), enforcing rights against infringers and at numerous trade shows both in the US and abroad, and enforcing its rights on private websites offering imitation products for sale.  Since January alone, Plaintiff has filed over 50 take-down requests to Amazon.com requesting the removal of imitation product sold on Amazon.com.

28.   <u>Regarding whether actual purchasers associate the product with Plaintiffs</u>, given Plaintiffs extensive, nation-wide, uninterrupted sales, over the last nine years, with its continuous advertising on social media, which advertising includes images of the Trade Dress Designs, Plaintiff can show through customer survey evidence that its Trade Dress Designs are something that consumers associate with Plaintiff.  For example, Plaintiff is continuously alerted by customers when customers see Plaintiff's Trade Dress Design being sold by others

1  and/or mistakenly purchase imitation products using the Trade Dress Design on

2  other websites mistakenly thinking the products are those of Plaintiff.  Plaintiff can

3  further compile this evidence through customer surveys which are more proper at

4  the discovery stage of litigation.

5        29.     Further, to establish consumer association, the Jersey Trade Dress

6  designs have been worn by the following celebrities and/or received national

7  recognition in the following ways: (i) three different products embodying the

8  Jersey Trade Dress design worn by Lily Tomlin on Grace & Frankie, a Netflix

9  original; (ii) the Jersey Trade Dress design featured in A Cup of Frosting blog; (iii)

10  the Jersey Trade Dress design featured in LA Times Travel, and (iv) the Jersey

11  Trade Dress design featured in Curvy Magazine.

12        30.     Further, to establish consumer association, the Sheer Trade Dress

13  designs have been worn by the following celebrities and/or received national

14  recognition in the following ways: (i) the Sheer Trade Dress design embodied in

15  three different products worn by Lily Tomlin on Grace & Frankie, a Netflix

16  original; (ii) the Sheer Trade Dress design was worn by Jane Fonda; (iii) the Sheer

17  Trade Dress design embodied in two different products featured in A Cup of

18  Frosting blog; (iv) the Sheer Trade Dress design featured in O, The Oprah

19  Magazine; (vi) three products embodying the Sheer Trade Dress design featured in

20  Curvy Magazine; and (viii) the Sheer Trade Dress design featured in Huffington

21  Post as #2 Must Have Travel Accessory in an article featuring 30 Must have Travel

22  Accessories for 2015.

23        31.     Plaintiff further alleges that there is a substantial likelihood of

24  confusion among consumers between the Jersey Trade Dress and Defendant

25  Spanx's ARM TIGHTS products, and that there is a substantial likelihood of

26  confusion among consumers between the Sheer Trade Dress and Defendant

27  Spanx's SHEER FASHION products.  Likelihood of confusion does NOT require

28  actual confusion.  The existence of actual confusion is only one of a number of

factors that can be used to establish a likelihood of confusion, which factors include (1) the similarity of the marks; (2) the relatedness or proximity of the two companies' products or services; (3) the strength of the registered mark; (4) the marketing channels used; (5) the degree of care likely to be exercised by the purchaser in selecting goods; (6) the accused infringers' intent in selecting its mark; (7) evidence of actual confusion; and (8) the likelihood of expansion in product lines.

32.    With particular regard to the likelihood of confusion among consumers between the Jersey Trade Dress and Defendant's ARM TIGHT products, likelihood of confusion can be established by the fact that ARM TIGHTS, launched by Spanx in September 2017, embody <u>all</u> the trade dress elements of the Jersey Trade Dress and that, as marketed for use, are identical to the Jersey Trade Dress. ***Exhibit C*** illustrates a side-by-side comparison of the infringing ARM TIGHTS products and those of Plaintiff's products embodying the Jersey Trade Dress. In particular, as shown in Exhibit C, Defendant's ARM TIGHTS products are garments having long sleeves extending onto the forearms of the wearer, having a torso member, where the torso member ends just below the bust of the wearer, covers the breast of the wearer and includes a high back neckline, with a lower front neckline, and where the torso member and the arms are both form fitting to hug the contours of the body of the wearer, and where the arms of the garment are formed of a light-weight, smooth, jersey material having no visible design elements on the fabric.

33.    Further, Defendant Spanx and Plaintiff R and A are direct competitors of one another, selling identical products, sold for the same purpose and use, to the same target market (females), at similar price points (Defendant Spanx sells its products for $30.00-$57.00 while Plaintiff R and A sells its products for $40.00-$48.00), and through the same channels of trade (on-line, catalog sales and direct marketing to target consumers, retail stores and boutique).  In fact, Plaintiff R and

1  A has lost sales to its boutiques because the boutiques carried Defendant Spanx's

2  products and has further lost customers recently that now carry Defendant Spanx's

3  products over Plaintiff's products.

4          34.    The evidence further establishes that Defendant, in adopting the

5  Jersey Trade Dress of Plaintiffs, adopted Plaintiff's trade dress purposefully.  In

6  particular, on May 15, 2013, Jillian Doyle, Assistant to Sara Blakely, CEO of

7  Defendant Spanx, ordered two SLEEVEY WONDERS under sleeves from

8  Plaintiff R and A for Lisa Magazine, Executive Assistant to Sara Blakely.  The two

9  under sleeves were shipped directly to Defendant Spanx's headquarters in Georgia.

10  Plaintiff R and A sent one basic ¾ length black lace product and one basic ¾

11  length ivory mesh product to Defendant Spanx's headquarters in fulfillment of the

12  order.  *Exhibit D* attached hereto is a true and correct copy of the receipt sent to

13  Defendant Spanx in 2013 with the order.

14          35.    Plaintiff not only knew of Plaintiff's trade dress, but purposefully

15  purchased products from Plaintiff for use in the development of its own imitating

16  and infringing product line.  Evidence of this is further exemplified in vast

17  similarities in Defendant's marketing campaign to that of Plaintiff's marketing.

18          36.    The Jersey Trade Dress designs come in a variety of colors including

19  black, white, off-white, gray, sand, pink, cobalt blue, green, brown, purple, navy

20  blue, red, coral and mint.  All of the colors embody the Jersey Trade Dress.  The

21  ARM TIGHTS adopting the Jersey Trade Dress are also offered in all the same

22  colors, further promoting consumer confusion.

23          37.    Defendant markets ARM TIGHTS in the exact same manner as

24  Plaintiff R and A markets and sells its Jersey Trade Dress by showing ARM

25  TIGHTS on a torso next to a person wearing ARM TIGHTS under a sleeveless or

26  strapless dress or top, further creating consumer confusion between ARM TIGHTS

27  and Plaintiff's Jersey Trade Dress.

28

1    38.    Defendant markets ARM TIGHTS in the exact same manner as
2   Plaintiff R and A markets and sells its Jersey Trade Dress by photographing a
3   person wearing a sleeveless dress or top without ARM TIGHTS next to a
4   photograph of a person wearing the ARM TIGHTS under various styles of
5   sleeveless dresses or tops, further promoting consumer confusion.
6    39.    Lastly, shortly after ARM TIGHTS release, at least one Instagram
7   follower of Spanx believed that the Jersey Trade Dress Design of Plaintiffs worn
8   by Lily Tomlin on Grace and Frankie, a Netflix Original, were ARM TIGHTS
9   products, and posted the same on Defendant Spanx's Instagram account.  As set
10  forth above, sufficient factual evidence exists to plead all the elements of
11  likelihood of confusion between Plaintiff's Jersey Trade Dress and that of
12  Defendant's ARM TIGHTS products.  In another comment, a consumer noted that
13  SPANX new product looked at like the Trade Designs of Plaintiff.  *Exhibit E* is a
14  true and correct copy of a post on Defendant Spanx' Facebook page with a
15  follower commenting on ARM TIGHTS -- "they look a lot like Sleevey Wonders."
16   40.    With particular regard to the likelihood of confusion among
17  consumers between the Sheer Trade Dress and Defendant's SHEER FASHION
18  products, launched by Spanx on or around September 12, 2017, likelihood of
19  confusion can be established by the fact that SHEER FASHION embody <u>all</u> the
20  trade dress elements of the Sheer Trade Dress and that, as marketed for use, are
21  identical.  *Exhibit F* illustrates a side-by-side comparison of the infringing SHEER
22  FASHION products and those of Plaintiff's products embodying the Sheer Trade
23  Dress.  In particular, as shown in Exhibit F, Defendant's SHEER FASHION
24  products are garments having long sleeves extending onto the forearms of the
25  wearer, having a torso member, where the torso member ends just below the bust
26  of the wearer, covers the breast of the wearer and includes a high back neckline,
27  with a lower front neckline, and where the torso member and the arms are both
28  form fitting to hug the contours of the body of the wearer, and where the arms of

the garment are formed of a light-weight, smooth, jersey material having no visible design elements on the fabric.

41.     Again, Defendant Spanx and Plaintiff R and A are direct competitors of one another, selling identical products, sold for the same purpose and use, to the same target market (females), at similar price points (Defendant Spanx sells its products for $30.00-$57.00 while Plaintiff R and A sells its products for $40.00-$48.00), and through the same channels of trade (on-line, catalog sales and direct marketing to target consumers, retail stores and boutique).

42.     Further, the evidence establishes that Defendant, in adopting the Sheer Trade Dress of Plaintiffs, adopted Plaintiff's trade dress purposefully.  Plaintiff not only knew of Plaintiff's trade dress, but purposefully purchased products from Plaintiff for use in the development of its own imitating and infringing product line.  Evidence of this is further exemplified in vast similarities in Defendant's marketing campaign to that of Plaintiffs.  Sufficient factual evidence exists to plead all the elements of likelihood of confusion between Plaintiffs Sheer Trade Dress and that of Defendant's SHEER FASHION products.

43.     With few exceptions, ARM TIGHTS and SHEER FASHION are available in all the same colors as the Trade Dress Designs and all adopt and infringe the Trade Dress Designs regardless of color.  All ARM TIGHT products adopting the Jersey Trade Dress and all SHEER FASHION products adopting the Sheer Trade Dress are infringing Plaintiff's Trade Dress Designs, regardless of color.

44.     Likewise, Defendant markets SHEER FASHION in the exact same manner as Plaintiff R and A markets and sells its Sheer Trade Dress by showing SHEER FASHION on a torso next to a person wearing SHEER FASHION under a sleeveless or strapless dress or top, further creating and promoting consumer confusion between SHEER FASHION and Plaintiff's Sheer Trade Dress.

45.    Defendant further markets SHEER FASHION in the exact same manner as Plaintiff R and A markets and sells its Sheer Trade Dress by photographing a person wearing a sleeveless dress or top without SHEER FASHION next to a photograph of a person wearing the SHEER FASHION under various styles of sleeveless dresses or tops, further promoting consumer confusion.

46.    In summary, Defendant Spanx has acted in willful disregard of the laws protecting Plaintiff R and A's goodwill, and they have intentionally copied Plaintiff's R and A's Trade Dress Designs, with the intent to confuse and deceive, or threaten to confuse and deceive, the consuming public concerning the source, affiliation, connection, or sponsorship of Defendant Spanx's ARM TIGHTS and SHEER FASHION products. By its wrongful conduct, Defendant Spanx has traded upon and diminished Plaintiff R and A's reputation and goodwill in a manner likely to cause confusion over the source, affiliation, connection, or sponsorship of Plaintiff R and A's and Spanx's goods.

47.    As set forth above, Plaintiff and Defendant are direct competitors of one another, sell identical products that are sold for the same purpose and use, to the same target market (females), at similar price points (Defendant Spanx sells its products for $30.00-$57.00 while Plaintiff R and A sells its products for $40.00-$48.00), and through the same channels of trade (on-line, catalog sales and direct marketing to target consumers, retail stores and boutique).

48.    Statements made to consumers about which party, as between Plaintiff and Defendant, created their product first and were conversely first to market with their product, will create confusion as to source between Plaintiff and Defendant's products and will cause, in the mind of consumers, both products to be associated with the first producer.

49.    Further, when a product is advertised to be first invented and brought to market by one source, that one source's products will then be deemed the "original" and all other products will then be considered knock-offs or imitation

14

products.  Whether a product is the "original" or an "imitation" product is material to the purchasing decisions made by consumers.

50.     Here, Defendant Spanx mislead consumers into believing that ARM TIGHTS was a revolutionary new invention brought to consumers first by Spanx, which reinvents the way that women get dressed and which is able to transform one's wardrobe "unlike any other layering options" on the market to wear everything in one's closet, year round.  See *Exhibit G*, which is a true and correct copy of an Instagram advertisement for ARM TIGHTS.

51.     As shown in *Exhibit G*, Spanx's statements that her product is "unlike any other layering options" is not intended to recognize other like layering options, because according to her, those did not exist until now.  When read in context, her statement is intended to convey the creation of a new product category that can be worn with everything in one's closet, year round.  Her statements are intended to imply that there is nothing else on the market like Spanx's product.  Therefore, Defendant is claiming to have invented a new product category rather than a category that already exists, such as jackets or shawls.

52.     CEO Sara Blakely through Defendant Spanx's advertising and her own statements continually misled the public into believing that she was the first to invent and the first to market with *a revolutionary product concept that solves a problem that has never been solved before*.  See *Exhibit H*, which is a true and correct copy of an Instagram advertisement for ARM TIGHTS.

53     CEO Sara Blakely on Good Morning America, which aired on October 27, 2017, claimed that she invented a product that filled a "white space." In particular, she claimed to have so many sleeveless dresses and shirts that hang in her closet that she could not wear in the fall or winter, but now she can with her invention:

Yes, I have my own invention, just like all of these entrepreneurs and Spanx has launching Arm Tights, so, so listen, I'm wearing them right now but

they're amazing.  They allow women to wear everything sleeveless in their closet year-round and, so I always say, when I look for entrepreneurs, I look for people who fill the white space, someone who solves a problem, comes up with a better solution and then can explain to me why they are the best option. And, my frustration with this was that I had so many sleeveless dresses and shirts that hang in my closet that I can't wear in the fall or winter so this is a sleeveless dress and I threw on this shimmer silver.

***Exhibit I*** is a true and correct copy of the transcript provided by ABC of this segment.

54.    A feature article in the New York Post about Defendant Spanx's new product, ARM TIGHTS, noted that "Spanx founder Sara Blakely insists that the invention wasn't born out of a desire to slenderize arms but to squeeze more looks out of warm-weather clothing as temps drop."  The article quoted Blakely as stating, "My favorite things to invent are the ones women didn't realize they needed and can't live without…. Tights have been around for our legs for so many years, I was thinking, 'Why aren't there tights for our arms?'"  ***Exhibit J*** is a true and correct copy of a mobile preview of the New York Post article.

55.  At the very least, Defendant's statements, if not literally false, based upon Spanx's known and admitted use of Plaintiff's products to develop its own product line, is likely to mislead or confuse consumers as to source.  Spanx is touting its products as original, and as having created a new product category that never before existed.  <u>Consumer will believe that when they see products that appears to be "tights for arms" that Defendant's products are the source</u>.  If they are not Spanx's products, they are certainly imitation, knock-off Spanx products, because she told consumer that Spanx's product fills a white space never before filled and that Spanx invented something that had never before existed.

56.    Spanx's statements are not "puffery."  The statements are NOT outrageously unbelievable statements, but rather are believable statements that consumers would rely upon when making purchasing decisions.  Consumer purchasing decisions, if given the opportunity to generate through discovery, will show that the majority of consumers, when making purchasing decisions, DO

heavily consider whether they are buying products from the "original" product designer or buying "imitation" or "knock-off products."  This is especially true with clothing apparel products.

57.    Spanx's statement are intended to mislead the public into believing that she is the original creator of this concept product, and by implication, all other competitive products are imitation and/or inferior products.[1]

58.    Unlike other cases challenging the "origin" of the product, Spanx's statements here have a direct impact on consumer perception as to its products and the characteristics of Spanx's products.  Spanx's statements go beyond just stating that Spanx and/or Ms. Blakely invented a product or received a patent on a product that she did not in-fact invent.  Spanx states that its product fills a void in the market place, a "white space," by conceiving of, and bring to market, a product that never existed before.  The intention of Blakely's statements was to materially deceive consumers not into believing that Spanx's was coming out with a new and improved product, but that Spanx's "tights for arms" was a revolutionary new product, that Blakely conceived to solve a problem that had never before been solved.  In fact, "tights for arms" were conceived of long ago, as provided by the enormous amount of evidence offered by the USPTO in the rejection of the ARM TIGHTS trademark.

59.    Spanx intended for consumers to believe that its product was the first to market, the original product to solve a problem that had never been solved

---

[1] The statements made by the Supreme Court in *Dastar Corp. v. Twentieth Century Fox Film Corp.* are not applicable to the facts in this case.  In *Dastar*, the parties were not selling competitive products that could be confused as to "origin" based upon affirmative statements made by one party with an intent to cause confusion in the marketplace between two competitive products.  In fact, no affirmative statements as to inventorship or creation were made that could have influenced consumer perception. *Dastar* held that the Lanham Act does not prevent the unaccredited copying of an uncopyrighted work. The quoted statements by the Court in *Dastar* go directly to the definition of confusion as to "origin" of a <u>single</u> product – and do not concern affirmative statements made to the public intended to confuse consumers as the origin as between two competitive products.  The facts of *Dastar* simply do not apply here and are improper to apply to the current set of facts.  *Dastar* is not instructive for the "materiality" component of Plaintiff's false advertising claim under the Lanham Act.  *Dastar* was a passing off case involving the incorporation of unattributed public domain copyright material in a single product.

SECOND AMENDED COMPLAINT

1    before and was the first product to ever offer "tights for arms" to consumers.

2    These statements are not only false, but materially misleading to consumers in a

3    manner that directly impacts purchasing decisions.

4         60.    Given the sheer size of Spanx and the extreme resources it has at its

5    disposal, Spanx quickly penetrated the market with its false and misleading

6    advertising campaign, reaching a significantly large number of consumers very

7    quickly, and making an immediate material impact of the purchasing decisions of a

8    significant number of consumers.   Through the false and misleading statements

9    used by Spanx in the marketing and advertising of its products, Spanx quickly

10   impacted the commercial impression of consumers and then influenced them and

11   their purchasing decisions by leading them to unfairly believe that Spanx was the

12   original creator of "tights for arms," which Spanx claimed was a product that never

13   before existed in the marketplace or that was not available for purchase until that

14   moment.  This caused consumers to immediately confuse Plaintiff's products to

15   either be those of Spanx's tights for arms or to be an imitation, knock-off or

16   inferior product to Spanx.  These acts clearly constituted unfair competition under

17   the Lanham Act.

18        61.    Additionally, while Plaintiff R and A does not market its trade dress

19   designs as "tights for arms," the visual appearance of the Trade Dress Designs are

20   such that they appear to be tights for arms, thus further causing confusion in the

21   marketplace with Spanx's ARM TIGHTS and SHEER FASHION products.

22        62.    Hence, Spanx is misleading consumers to believe that all other

23   products offering the same solution are imitation, inferior, knock-off products,

24   even though Spanx used other products in the development of its product line.

25   Blakely's statements are false and materially misleading, with a purpose of

26   influencing consumer's purchasing decisions, causing confusion as to source in the

27   market place, and unfairly causing consumers to believe that other prior

28   competitive products are imitations, knock-offs or inferior products.

**FIRST CAUSE OF ACTION**

**(Trade Dress Infringement – Lanham Act 15 U.S.C. § 1125)**

63.    Plaintiff R and A repeats and re-alleges each allegation set forth above as if set forth fully herein.

64.    Plaintiff R and A has manufactured, advertised, distributed, marketed, promoted and offered its Trade Dress Designs for sale since December 15, 2011.

65.    Plaintiff R and A's Trade Dress Designs have been sold continuously and without interruption over five years, across the United States and internationally, and have acquired secondary meaning and distinctiveness such that consumers recognize Plaintiff's Trade Dress Designs as coming from a unique source, which is Plaintiff R and A.

66.    Defendant Spanx's ARM TIGHTS adopted all of Plaintiff's Jersey Trade Dress and its SHEER FASHION products adopted all of Plaintiff's Sheer Trade Dress such that Spanx's ARM TIGHTS are likely to cause confusion as to the source with Plaintiff's Jersey Trade Dress and Spanx's SHEER FASHION products are likely to cause confusion as to the source with Plaintiff's Sheer Trade Dress or vice versa (creating reverse confusion).

67.    Defendant Spanx knew of the commercial success of Plaintiff R and A's Trade Dress Designs and Defendant Spanx willfully used Plaintiff's Trade Dress Designs in connection with the sale, offering for sale, distribution and/or advertising of ARM TIGHTS and SHEER FASHION products in a manner likely to cause confusion, or to cause mistake, or to deceive customers that Defendant Spanx's ARM TIGHTS and SHEER FASHION products are products from Plaintiff R and A or otherwise associated with or authorized by Plaintiff R and A, and/or deceive customers into thinking that SLEEVEY WONDERS under sleeves are those of Defendant Spanx, thereby creating reverse confusion.

68.    Defendant Spanx's conduct described above constitutes trade dress infringement in violation of 15 U.S.C. § 1125.

1    69.    The actions of Defendant Spanx, if not enjoined, will continue.

2    70.    Plaintiff R and A have suffered and continue to suffer damages in an

3    amount to be proven at trial in excess of this Court's jurisdictional limit.

4    71.    Plaintiff R and A is further entitled to injunctive relief to prevent

5    Defendant Spanx's infringement.

6    72.    Pursuant to 15 U.S.C. §§ 1117 and 1125, Plaintiff R and A is entitled

7    to recover damages, profits made by Defendant Spanx and the costs of this action.

8                        **SECOND CAUSE OF ACTION**

9    **(Federal Unfair Competition and False Advertising under 15 U.S.C. §1125(a)**
     **against all Defendants)**
10

11    73.    Plaintiff R and A repeats and re-alleges each allegation set forth above

12    as if set forth fully herein.

13    74.    Plaintiff R and A and Defendant Spanx are direct competitors of one

14    another.

15    76.    Defendant Spanx's actions described above and specifically, without

16    limitation, Defendant Spanx claims of reinventing the way that women get dressed

17    and transforming one's wardrobe "unlike any other layering options" on the market

18    to wear everything in one's closet, year round, and filling a "white space" with its

19    product are misleading the public into believing that Defendant Spanx was the first

20    to invent and first to market with a revolutionary original concept and product that

21    solves a problem that has never been solved before.

22    77.    Defendant Spanx CEO Blakely, through her false statements

23    identifying Defendant Spanx as the creator of a new product category is further

24    intentionally confusing and deceiving the consuming public as to the source,

25    affiliation, connection, or sponsorship of the Spanx ARM TIGHTS with those

26    products of Plaintiff.

27    78.    Defendant Spanx's use in commerce to advertise, market, and sell

28    ARM TIGHTS throughout the United States, including California, using false and

1  misleading statements constitute unfair competition and false advertising in

2  violation of 15 U.S.C. § 1125(a).

3        79.    Consumers are likely to be misled and deceived by Defendant Spanx's

4  representations.

5        80.    Defendant Spanx knew that its statements were materially misleading

6  and likely to mislead consumers and impact the purchasing decisions of

7  consumers.

8        81.    As an actual and proximate result of Defendant Spanx willful and

9  intentional actions, Plaintiff R and A has suffered damages in an amount to be

10  determined at trial in excess of the jurisdictional limit of this Court, and unless

11  Defendant Spanx is enjoined, Plaintiff R and A will continue to suffer irreparable

12  harm and damage to its business, reputation, and goodwill.

13        82.    Pursuant to 15 U.S.C. § 1117, Plaintiff R and A is entitled to damages

14  for Defendant Spanx's Lanham Act violations, an accounting for profits made by

15  Defendant Spanx on sales of ARM TIGHTS products, as well as recovery of the

16  costs of this action. Furthermore, Plaintiff R and A is informed and believes, and

17  on that basis alleges, that Defendant Spanx's conduct was undertaken willfully and

18  with the intention of causing confusion, mistake or deception, making this an

19  exceptional case entitling Plaintiff R and A to recover additional damages and

20  reasonable attorneys' fees pursuant to 15 U.S.C. § 1117.

21                        **THIRD CAUSE OF ACTION**

22  **(Statutory Unfair Competition and False Advertising under California**
23  **Business and Professions Code §§ 17200 and 17500 *et seq.*)**

24        83.    Plaintiff R and A repeats and re-alleges each allegation set forth above

25  as if set forth fully herein.

26        84.    Since at least May of 2013, Defendant Spanx knew of Plaintiff R and

27  A's under sleeves products and had ordered and received at least one of Plaintiff R

28  and A's under sleeves products and associated packaging and marketing materials.

85.   In September 2017, Defendant Spanx launched products ARM TIGHTS and SHEER FASHION products in direct competition with Plaintiff R and A.

86.   Defendant Spanx ARM TIGHTS and SHEER FASHION products are nearly identical in appearance to Plaintiff R and A's SLEEVEY WONDER under sleeves product so as to confuse the consumers as to source.

87.   In connection with Defendant Spanx's sales and marketing of ARM TIGHTS and SHEER FASHION products, Defendant Spanx has used false or misleading description of fact or false or misleading description or representations of fact misleading the public into believing that Plaintiff R and A products are those of Defendant Spanx and/or are imitation, inferior or knock-off products of Defendant's Spanx.

88.  Under the unfairness prong of California Business and Professions Code §17200, a practice may be deemed unfair even if not specifically proscribed by some other law.

89.  In particular, Defendant Spanx, with access to Plaintiff R and A's products and marketing material, has marketed its product with representations that make the consuming public believe that Spanx was the first to market with an product that never before existed, all the while having used Plaintiff R and A products in the creation of its products.

90.   Defendant Spanx's unlawful business acts significantly impaired Plaintiff R and A's marketing and licensing opportunities, including depriving Plaintiff R and A of the benefits that naturally flow from being the original creator of Plaintiff R and A's under sleeves products, such as premium pricing, greater retail interest, and licensing opportunities.

91.   Consumers are likely to be misled by Defendant Spanx's representations, and Defendant Spanx knew or should have known that its statements and use of Plaintiff R and A's marketing and advertising materials were

22
SECOND AMENDED COMPLAINT

1   likely to mislead the consuming public. Defendant Spanx's claims, non-

2   disclosures, misleading statements and copying of Plaintiff R and A's products and

3   materials, as more fully set forth above, were false, misleading, and/or likely to

4   deceive the consuming public within the meaning of California Business and

5   Professions Code §17200.

6       92.   Further, Plaintiff R and A's Trade Dress Designs having been sold

7   continuously and without interruption for over five years, across the United States

8   and internationally, and have acquired secondary meaning such that consumers

9   recognize Plaintiff R and A's Trade Dress Designs as coming from a unique

10  source, which is Plaintiff R and A.

11      93.   Both Defendant Spanx's ARM TIGHTS and SHEER FASHION

12  products use Plaintiff R and A's Trade Dress Designs such that they are likely to

13  cause confusion as to the source with the SLEEVEY WONDERS product using

14  Plaintiff R and A's Trade Dress Designs and with Defendant Spanx's products or

15  vice versa (creating reverse confusion).

16      94.   Defendant Spanx knew of the commercial success of Plaintiff R and

17  A's SLEEVEY WONDERS products and Defendant Spanx willfully used Plaintiff

18  R and A's Trade Dress Designs in connection with the sale, offering for sale,

19  distribution and/or advertising of ARM TIGHTS and SHEER FASHION products

20  in a manner likely to cause confusion, or to cause mistake, or to deceive customers

21  that Defendant Spanx's products derives from Plaintiff R and A or otherwise

22  associated with or authorized by Plaintiff R and A, and/or deceive customers into

23  thinking that SLEEVEY WONDERS products using Plaintiff R and A's Trade

24  Dress Designs are those of Defendant Spanx, thereby creating reverse confusion.

25      95.   Defendant Spanx sale of product confusingly similar in appearance to

26  Plaintiff R and A's Trade Dress Designs and its advertising, marketing, and selling

27  ARM TIGHTS and SHEER FASHION products throughout the United States,

28  including California, using Plaintiff R and A's Trade Dress Designs, false and

misleading statements and advertising and marketing confusingly similar to Plaintiff R and A's products, all in a manner likely to cause mistake, or to deceive customers that Defendant Spanx's products derives from Plaintiff R and A or otherwise associated with or authorized by Plaintiff R and A, and/or deceive customers into thinking that SLEEVEY WONDERS products and Plaintiff R and A's Trade Dress Designs are those of Defendant Spanx constitute unfair competition and false advertising in violation of the statutory law of the state of California, Cal. Bus. & Prof. Code §§ 17200 and 17500, *et seq.* As a result, Plaintiff R and A has suffered and will continue to suffer damage to its business, reputation, and goodwill.

96.     As a direct and proximate result of Defendant Spanx's willful and intentional actions, Plaintiff R and A has suffered damages in an amount to be determined at trial and in excess of this Court's jurisdictional limit and, unless Defendant Spanx is restrained, Plaintiff R and A will continue to suffer irreparable damage.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff R and A prays that this Court enter judgment against Defendant Spanx as follows:

A.     That Plaintiff R and A be granted injunctive relief under 15 U.S.C. § 1051 *et seq.*; California Business and Professions Code §§ 17200 and 17500 *et seq.*; and federal law and California common law of trademark infringement; specifically, that Defendant Spanx and all of their respective officers, agents, servants, representatives employees, attorneys, and all other persons acting in concert with them be enjoined from:

1.     selling, offering for sale or advertising or marketing for sale ARM TIGHTS and SHEER FASHION products, or any other products confusingly similar in style and appearance to Plaintiff's Trade Dress Designs;

2.      directly or indirectly engaging in false or misleading advertising or promotions of ARM TIGHTS and SHEER FASHION products that create confusion as to source and/or mislead the public into believing that ARM TIGHTS provides a solution to women's fashion that never before existed and/or that lead consumers to believe that Plaintiff's products are imitations of Defendants.

B.      That Defendant Spanx file, within ten (10) days from entry of an injunction, a declaration with this Court signed under penalty of perjury certifying the manner in which Defendant Spanx has complied with the terms of the injunction;

C.      That Defendant Spanx be ordered to correct any erroneous impression persons may have derived concerning the nature, characteristics, or qualities or source of ARM TIGHTS and SHEER FASHION products, including without limitation, ceasing to advertise the product under the brand ARM TIGHTS as a solution to women's fashion that never before existed.

D.      That Defendant Spanx be adjudged to have violated 15 U.S.C. § 1125 et seq. by willfully adopting Plaintiff's Trade Dress Designs in connection with the sale, offering for sale, distribution and/or advertising of ARM TIGHTS and SHEER FASHION products in a manner likely to cause confusion, or to cause mistake, or to deceive customers into believing that Defendant Spanx's products are Plaintiff R and A's products or otherwise associated with or authorized by Plaintiff R and A, and/or deceive customers into thinking that Plaintiff R and A's Trade Dress Designs are those of Defendant Spanx, thereby creating reverse confusion.

E.      That Defendant Spanx be adjudged to have violated 15 U.S.C. § 1125 by unfairly competing against Plaintiff R and A by using false, deceptive or misleading descriptions or representations of fact that misrepresent the nature, quality and characteristics of Defendant Spanx's products;

F. That Defendant Spanx be adjudged to unlawfully and unfairly compete against Plaintiff R and A under the laws of the State of California, Cal. Bus. & Prof.

Code § 17200, et seq.;

G.      That Plaintiff R and A be awarded damages pursuant to 15 U.S.C. § 1117(a) for unfair competition and false advertising and trade dress infringement, in an amount, sufficient to compensate it for the damage caused by Defendant Spanx;

H.      That Plaintiff R and A be awarded Defendant Spanx's profits derived by reason of said acts, or as determined by said accounting;

I.      That such damages and profits be trebled and awarded to Plaintiff R and A and that it be awarded its costs, attorneys' fees and expenses in this suit under 15 U.S.C. § 1117, as a result of Defendant Spanx's willful, intentional, and deliberate acts in violation of the Lanham Act;

J.      That Plaintiff R and A be awarded damages in an amount sufficient to compensate it for the damage caused by Defendant Spanx's unfair competition and false advertising under California Business and Professions Code §§ 17200 and 17500 *et seq.* and trademark infringement under federal law and California common law;

K.      That Plaintiff R and A be granted prejudgment and post judgment interest;

L.      That Plaintiff R and A be granted costs associated with the prosecution of this action; and

M.      That Plaintiff R and A be granted such further relief as the Court may deem just, including but not limited to punitive damages and attorneys' fees.

Dated:  May 22, 2019                    **AVYNO LAW P.C.**

By: /s/ Jennifer H. Hamilton
       Jennifer H. Hamilton

Attorneys for Plaintiff
R and A Synergy, LLC

SECOND AMENDED COMPLAINT

**DEMAND FOR JURY TRIAL**

Plaintiff R and A requests a jury trial on all issues properly triable to a jury.

Dated:  May 22, 2019                     Avyno Law P.C.


                                         /s/ Jennifer H. Hamilton
                                         Jennifer H. Hamilton

                                         Attorneys for Plaintiff
                                         R and A Synergy, LLC

SECOND AMENDED COMPLAINT

1

**PROOF OF SERVICE**

2

3        I hereby certify that on May 22, 2019, I electronically transmitted the

4   foregoing document using the CM/ECF system for filing, which will transmit the

5   document electronically to all registered participants as identified on the Notice of

6   Electronic Filing, and paper copies have been served on those indicated as

7   nonregistered participants.

8

                                            /s/ Rebecca Meegan

9                                           Rebecca Meegan

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

SECOND AMENDED COMPLAINT